**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

KAIJUN KANE LIM,                                    :
                                                    :
                              Plaintiff,            :
                                                    :        24 Civ. 7399 (GS)
              - against -                           :
                                                    :        OPINION & ORDER
JONATHAN KOON, BECAUSE LIFE IS NOT                  :
GUARANTEED, INC., and NUMBER 8IGHT                  :
BRAND LIMITED,                                      :
                                                    :
                              Defendants.           :
                                                    :
------------------------------------------------------------X

**GARY STEIN, United States Magistrate Judge:**

This action arises from commercial agreements entered into between Plaintiff
Kaijun Kane Lim ("Plaintiff" or "Lim") and Defendants Jonathan Koon ("Koon"),
Because Life Is Not Guaranteed, Inc. ("BLING"), and Number 8ight Brand, Ltd.
("No. 8").  Lim asserts a single claim against No. 8 for breach of contract and
multiple claims against Koon and BLING for breach of contract, fraudulent
inducement, fraud, and breach of the implied covenant of good faith and fair
dealing.  (*See* Amended Complaint, Dkt. No. 19 ("Am. Compl.")).

Before the Court are Defendant No. 8's motion to dismiss for lack of personal
jurisdiction and insufficient service of process pursuant to Fed. R. Civ. P. 12(b)(2)
and 12(b)(5) (*see* Dkt. No. 20), and Defendants Koon and BLING's motion to dismiss
Lim's claims for fraudulent inducement, fraud, and breach of the implied covenant
of good faith and fair dealing pursuant to Fed. R. Civ. P. 12(b)(6) and (with respect
to the fraud claim) Fed. R. Civ. P. 9(b) (*see* Dkt. No. 23).  Plaintiff opposes both
motions.  (*See* Dkt. Nos. 34, 33).

For the reasons set forth below, No. 8's motion to dismiss under Rule 12(b)(2) is **DENIED**; No. 8's motion to dismiss under Rule 12(b)(5) shows that service on No. 8 was insufficient and service is therefore **QUASHED**; Koon and BLING's motion to dismiss under Rule 12(b)(6) is **GRANTED IN PART** and **DENIED IN PART**; and Koon and BLING's motion to dismiss under Rule 9(b) is **DENIED**.

## BACKGROUND

### A. Plaintiff's Allegations[1]

#### 1. The Parties' Agreements

In February 2019, Lim, a self-described entrepreneur and philanthropist who resides in Los Angeles, California, began shooting Bling Empire, a Netflix reality television series. (Am. Compl. ¶¶ 1, 2, 20). Lim played a starring role in the show, which followed the lives of several Los Angeles-based Asian and Asian American individuals. (*Id.* ¶ 20). The show was released in January 2021 and thereafter was renewed for two more seasons. (*Id.* ¶ 21).

Lim was introduced to Koon, a Chinese American entrepreneur based in Long Island, New York, in Spring 2021. (*Id.* ¶¶ 3, 23-24). Koon was seeking media attention for No. 8, a fashion brand for which he designed jewelry. (*Id.* ¶ 24). Following discussions with Koon, Lim agreed to use his role on Bling Empire to feature and endorse No. 8's jewelry products. (*Id.* ¶¶ 25-26).

---

[1] The facts set forth below reflect the allegations in Plaintiff's Amended Complaint, which are assumed to be true for purposes of this motion. *See R.M. Bacon LLC v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 509, 512 (2d Cir. 2020).

On or about August 5, 2021, Koon and Lim executed an Endorsement Agreement dated as of July 30, 2021. (*Id.* ¶ 27 & Ex. 2 ("No. 8 Endorsement Agreement")). Koon signed the agreement on behalf of No. 8 as its "Creative Director." (Ex. 2 at 5). Pursuant to the No. 8 Endorsement Agreement, Lim agreed to promote No. 8's products on Bling Empire in exchange for, *inter alia*, a 10% commission on net sales. (*Id.* § 5(c); *see* Am. Compl. ¶ 32).

The following year, Lim and Koon decided to launch a socially conscious fashion brand, BLING. (Am. Compl. ¶ 62). On March 16, 2022, Koon emailed Lim a proposal describing BLING as a "socially responsible lifestyle brand" that would donate "10% of all revenues to select charities that are targeted to assist and support children that are less fortunate." (*Id.* ¶ 63 & Ex. 4 ("BLING Proposal Email") at 2). On April 25, 2022, the parties executed two agreements: a Pre-Incorporation Shareholders' Agreement between Lim and Koon (*id.* ¶ 64 & Ex. 1 ("Shareholders' Agreement")) and an Endorsement Agreement (*id.* ¶ 69 & Ex. 5 ("BLING Endorsement Agreement")) (together, "BLING Agreements").

The Shareholders' Agreement set forth, *inter alia*, the capital contributions of both Lim and Koon, their respective ownership interests, and their operational responsibilities. (Am. Compl. Ex. 1 §§ 2, 5). Pursuant to the Shareholders' Agreement, Lim was obligated to contribute $81,600 in exchange for a 20% interest in BLING, and Koon was obligated to contribute $326,400 for an 80% interest. (*Id.* § 2). The BLING Endorsement Agreement required Lim, *inter alia*, to publicly promote and wear BLING products during his appearances on Bling Empire. (Am.

Compl. Ex. 5 § 4(a).  In exchange, Lim was to receive a 5% royalty on net sales until he recouped his $81,600 capital contribution, at which point his right to royalties would cease.  (*Id*. § 6(a)).  Neither agreement contained any obligation for BLING or Koon to donate 10% of net sales—or any amount—to charity, as proposed by Koon in the BLING Proposal Email.

The next day, on April 26, 2022, BLING was formally incorporated as an S Corporation.  (Am. Compl. ¶ 75).  On April 29, 2022, Lim contributed $81,600 pursuant to the Shareholders' Agreement.  (*Id*. ¶ 74).  At an unspecified time, Koon also transferred his capital contribution of $326,400 to BLING.  (*Id*. ¶ 111).

On July 1, 2022, BLING began operations.  (*Id*. ¶ 5).  On July 11, 2022, Lim acquired 4,902 additional shares in the company for $20,000.16.  (*Id*. ¶ 77).  In total, Lim contributed $101,600.16 to BLING.  Lim alleges that he used his influence to obtain press coverage for BLING, focusing on its charitable purpose.  (*Id*. ¶¶ 78-81).

## 2. Defendants' Alleged Wrongdoing

According to Lim, Koon proceeded to deprive Lim of the benefits to which Lim was entitled under the parties' contractual agreements, reneged on his promise to donate 10% of BLING's revenues to charity, and misappropriated Lim's investment funds, using No. 8, BLING, and Tykoon as his "alter egos to perpetuate fraud to escape personal liability."  (*Id*. ¶ 1).

First, Lim alleges that despite "having faithfully performed all of his obligations under the No. 8 Endorsement Agreement, Koon and No.8 have materially breached their obligations by wrongfully refusing to compensate [him]."

4

(*Id.* ¶ 55).  In particular, Lim claims he was owed $280,000 in appearance fees under the No. 8 Endorsement Agreement because he caused No. 8 products to appear in Bling Empire shows and related Instagram posts and used his best efforts to do so.  (*Id.* ¶¶ 53-54).  But all he has received for his efforts is a mesh ring that No. 8 had previously lent him, valued by Koon at $18,000.  (*Id.* ¶¶ 57, 60).

In February 2023, Lim's agents contacted Koon and demanded payment pursuant to the No. 8 Endorsement Agreement, which Koon wrongfully denied on the grounds that No. 8 was never mentioned on Bling Empire.  (*Id.* ¶ 56).  In March 2024, after Lim terminated his business relationship with Koon, Lim's agents renewed this demand, and Koon again rejected it.  (*Id.* ¶¶ 58-59).  Lim alleges that Koon "never had any intention" of fulfilling No. 8's obligations under the No. 8 Endorsement Agreement.  (*Id.* ¶ 61).

Similarly, Lim claims that, although he performed his obligations to endorse BLING products, he was not paid the $81,600 in royalties owed him under the BLING Endorsement Agreement.  (*Id.* ¶¶ 97, 118-19).  On May 23, 2023, Lim received a royalty report from Kitty Li, an employee of Tykoon Brand Holdings, LLC ("Tykoon") (another Koon-controlled entity), stating that Lim was owed $4,406.86 in royalties.  (*Id.* ¶ 82; *see id*. ¶ 11).  That amount was paid months later. (*Id.* ¶ 82).  Although Lim was entitled to royalty reports and royalty payments every quarter, this is the only royalty report and payment he has received, despite repeated requests made by him and his representatives.  (*Id.* ¶¶ 72-73, 83, 89-91, 97, 100).

In January 2024, Lim learned that BLING had been operating at a loss.  (*Id.* ¶ 84).  Around the same time, Koon requested that Lim invest an additional $200,000 into the company, which Lim declined.  (*Id.*).  Lim requested that Koon remove his name, image, and likeness from the BLING brand.  (*Id.* ¶ 89).  On March 18, 2024 Koon told Lim via email that BLING would honor Lim's request, and that BLING would "cease to do any further business" due to "the unwillingness of shareholders to advance additional [necessary] capital."  (*Id.* & Ex. 3 at 10-11).  Lim responded that same day, alleging that Koon was in breach of the No. 8 and BLING Endorsement Agreements.  (Ex. 3 at 10).  Koon replied the next day, stating that, *inter alia*, he was not personally a party to any such contracts.  (*Id.* at 9-10).

Lim in turn complained of BLING's failure to donate 10% of net sales to charity.  (*Id.* at 8-9).  Koon replied that neither he nor BLING had ever promised to donate 10% of all revenues to charity.  (*Id.* at 7-8; *see* Am. Compl. ¶ 92).  Lim alleges that Koon's denial is untrue, pointing to a statement on BLING's website (operated by Koon) that "[t]he brand donates 10% of all revenues to select charities that are targeted to assist and support people that are less fortunate."  (Am. Compl. ¶ 93).

Not only did Koon fail to donate 10% of BLING's revenues to charity, and pay the required royalties to Lim, but Koon also is alleged to have "used BLING to perpetuate [a] fraudulent scheme on Lim."  (*Id.* ¶ 99).  Specifically, Lim claims that in response to a demand from his counsel on May 2, 2024, Koon's attorneys provided bank statements for a BLING bank account and other financial records.  (*Id.* ¶ 98). The bank statements, according to Lim, revealed that "while operating BLING,

Koon improperly transferred over $396,000 from the BLING bank account to a personal bank account that Koon maintains." (*Id.*).  Lim further alleges that Koon siphoned off Lim's $100,000 in investment funds to pay bills and expenses for Koon's other companies and to "fund his extravagant lifestyle." (*Id.* ¶ 99).

Based on these allegations, the Amended Complaint contains six causes of action.  The first three are for breach of contract.  Count 1 is asserted against Koon and No. 8 and alleges breach of the No. 8 Endorsement Agreement.  (*Id.* ¶¶ 101-07).  Count 2 is asserted against Koon only and alleges breach of the Shareholders' Agreement.  (*Id.* ¶¶ 108-13).  Count 3 is asserted against both Koon and BLING and alleges breach of the BLING Endorsement Agreement.  (*Id.* ¶¶ 114-20).  The last three causes of action assert claims against Koon and BLING for fraudulent inducement (*id.* ¶¶ 121-25 (Count 4)), fraud (*id.* ¶¶ 126-32 (Count 5)), and breach of the implied covenant of good faith and fair dealing (*id.* ¶¶ 133-37 (Count 6)).[2]

## B. Procedural History

Lim initiated the instant action and filed his initial Complaint on September 30, 2024 (Dkt. No. 1), and filed his Amended Complaint on December 20, 2024 (Dkt. No. 19).  Attached to Lim's pleading are the three contractual agreements at issue as well as certain email correspondence.  (Am. Compl. Exs. 1-5).

---

[2] The Amended Complaint alleges that Lim lives in Los Angeles and that Koon lives in, and that BLING and No. 8 are based in, Long Island.  (*Id.* ¶¶ 2-4, 6).  It does not allege that venue is proper because any of the relevant events giving rise to Lim's claims took place in the Southern District of New York.  Rather, Lim alleges that venue is proper under 28 U.S.C. § 1391(b)(1) by virtue of a forum selection clause in the Shareholders' Agreement designating the state or federal courts located in the City and County of New York as the venue for disputes.  (*Id.* ¶ 19; *see* Ex. 1 § 11.4).  No Defendant disputes the propriety of venue in this District on this motion.

On January 31, 2025, Koon and BLING moved to dismiss Counts 4, 5, and 6—the claims for fraudulent inducement, fraud, and breach of the implied covenant of good faith and fair dealing—for failure to state a claim.  (*See* Dkt. Nos 23 & 24 ("K&B Mot.")).  On that same day, No. 8 moved to dismiss all claims against it for lack of personal jurisdiction and inadequate service of process (*see* Dkt. Nos. 20 & 22 ("No. 8 Mot.")), along with the Declaration of Frederick Li, No. 8's Managing Director (Dkt. No. 21 ("Li Decl.")).  Thereafter, the parties consented to jurisdiction before the undersigned for all purposes.  (Dkt. No. 30).

On April 11, 2025, Plaintiff filed briefs in opposition to both motions.  (*See* Dkt. Nos. 33 ("K&B Opp."), 34 ("No. 8 Opp.")).  On May 16, 2025, Koon and BLING filed their reply brief.  (Dkt. No. 37 ("K&B Rep.")).  On May 17, 2025, No. 8 filed its reply brief (Dkt. No. 38 ("No. 8 Rep.")), along with the declaration of Ronald L. Monterosso, the attorney who drafted the No. 8 Endorsement Agreement (Dkt. No. 39 ("Monterosso Decl.")).

## LEGAL STANDARD

### A. Motion to Dismiss Under Rule 12(b)(2)

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant."  *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996).  "Where there has been no discovery or evidentiary hearing, as here, a plaintiff seeking to defeat a motion to dismiss based on the lack of personal jurisdiction need only make a prima facie showing that jurisdiction exists."  *Pearson*

*Educ., Inc. v. ABC Books LLC*, No. 19 Civ. 7642 (RA), 2020 WL 3547217, at *3 (S.D.N.Y. June 30, 2020) (citing *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013)).

"[T]he plaintiff's *prima facie* showing 'must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Citadel Sec. Ams. LLC v. Portofino Techs. AG*, No. 23 Civ. 5222 (GHW), 2024 WL 4635452, at *3 (S.D.N.Y. Oct. 31, 2024) (quoting *In re Terrorist Attacks on September 11, 2001,* 714 F.3d 659, 673 (2d Cir. 2013)).  To make the requisite *prima facie* showing, "the plaintiff may rely on the complaint, affidavits, and other supporting evidence." *Warner Bros. Ent. Inc. v. Ideal World Direct*, 516 F. Supp. 2d 261, 265 (S.D.N.Y. 2007).

"On a 12(b)(2) motion, the Court must 'construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor,'" *Pearson Educ.*, 2020 WL 3547217, at *3 (quoting *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)), and "must accept the allegations in the Complaint as true 'to the extent they are uncontroverted' by any affidavits submitted by the defendant, 'which the district court may also consider,'" *id.* (quoting *GlaxoSmithKline LLC v. Laclede, Inc.*, No. 18 Civ. 4945 (JMF), 2019 WL 293329, at *3 (S.D.N.Y. Jan. 23, 2019)).  Nonetheless, the Court "will not draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks,* 714 F.3d at 673 (citations omitted).  "Thus, the plaintiff in opposing a 12(b)(2) motion cannot rely merely on

conclusory statements or allegations; rather, the prima facie showing must be factually supported." *Pearson Educ.*, 2020 WL 3547217, at *3 (cleaned up).

## B. Motion to Dismiss Under Rule 12(b)(5)

"When a defendant moves to dismiss for insufficient service of process under Rule 12(b)(5), 'the plaintiff bears the burden of establishing that service was sufficient.'" *W.J. Deutsch & Sons Ltd. v. Zamora*, No. 21 Civ. 11003 (LTS), 2023 WL 5609205, at *3 (S.D.N.Y. Aug. 30, 2023) (quoting *Khan v. Khan*, 360 F. App'x 202, 203 (2d Cir. 2010)). "'In considering a motion to dismiss pursuant to Rule 12(b)(5), the Court may look beyond the pleadings, including to affidavits and supporting materials, to determine whether service was proper.'" *Id.* (quoting *Vega v. Hastens Beds, Inc.*, 339 F.R.D. 210, 215 (S.D.N.Y. 2021)).

"Upon a finding of insufficient service, the Court may dismiss the case or may, in its discretion, retain the case, quash service, and direct that service be effectuated properly." *Vega*, 339 F.R.D. at 217. "'Motions under . . . Rule 12(b)(5) differ from the other motions permitted by Rule 12(b) somewhat in that they offer the court a course of action other than simply dismissing the case when defendant's defense or objection[ ] is sustained.'" *Id.* (quoting *Fed. Home Loan Mortg. Corp. v. Dutch Lane Assocs.,* 775 F. Supp. 133, 138 n.2 (S.D.N.Y. 1991)) (alteration in original).

## C. Motion to Dismiss Under Rule 12(b)(6)

Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." "To survive a motion to dismiss, a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 566 U.S. at 678. The factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 (complaint must raise "more than a sheer possibility that a defendant has acted unlawfully").

In considering a motion to dismiss under Rule 12(b)(6), the Court must "accept[ ] all factual allegations in the complaint as true" and "draw[ ] all reasonable inferences in the plaintiff's favor." *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (citation omitted). Courts need not, however, consider "conclusory allegations or legal conclusions couched as factual allegations." *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (citation omitted); *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Determining whether a plausible claim has been pled is "a context-specific task" that requires the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *Herrera v. Comme des Garcons, Ltd.*, 84 F.4th 110, 113 (2d Cir. 2023). However, "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Twombly*, 550 U.S. at 556

11

(citation omitted).  "[T]he court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side[.]"  *Lynch v. City of N.Y.*, 952 F.3d 67, 75 (2d Cir. 2020).

## DISCUSSION

The Court first analyzes No. 8's arguments in support of its motion to dismiss, and then turns to Koon and BLING's arguments for dismissal.

### A.  No. 8's Motion to Dismiss

No. 8 advances two arguments for dismissal.  First, No. 8 contends that it is a foreign corporation based in Hong Kong that "has no connection or the requisite minimum contacts with New York State, and as a result, New York's long-arm statute cannot be the basis for establishing personal jurisdiction over it."  (No. 8 Mot. at 1).  Second, No. 8 contends that even if it was subject to personal jurisdiction in New York, it was not properly served with the summons and complaint in this action, as service was effected on an "unknown representative" of Tykoon with no affiliation with No. 8.  (*Id.*).

### 1.  Personal Jurisdiction

"To determine whether personal jurisdiction exists over a non-domiciliary, the court engages in a two-step inquiry.  First, the court determines whether the laws of the forum state permit the exercise of jurisdiction over the defendants.  If the laws of the forum state permit jurisdiction, the court then determines whether the exercise of such jurisdiction comports with the requirements of due process."  *Chatwal Hotels & Resorts LLC v. Dollywood Co.*, 90 F. Supp. 3d 97, 102-03

(S.D.N.Y. 2015) (citation omitted).  In the instant action, the first step is governed by New York Civil Practice Law and Rules ("N.Y. CPLR" or "CPLR") § 301, which provides for general jurisdiction, and § 302, which provides for specific jurisdiction in the State of New York.  At the second step, governed by constitutional due process considerations, the Court must determine whether the exercise of such jurisdiction under state law satisfies the federal due process requirements of "fair play and substantial justice."  *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476 (1985) (quoting *Int'l. Shoe Co. v. Wash.,* 326 U.S. 310, 320 (1945)).

The Amended Complaint asserts, and Lim argues in his opposition brief, that the Court has both general and specific jurisdiction over No. 8.  (*See* Am. Compl. ¶¶ 13, 17; No. 8 Opp. at 5-9).  No. 8 contends that neither general jurisdiction nor specific jurisdiction exists.  (No. 8 Mot. at 4-6; No. 8 Rep. at 2-5).

### a.  General Jurisdiction

"A court may assert general jurisdiction over foreign . . . corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citation omitted).  Generally, a corporation is "at home" only in its state of incorporation and the state of its principal place of business, except in an "exceptional case."  *Daimler AG v. Bauman*, 571 U.S. 117, 119, 139 n.19 (2014). "[W]hen a corporation is neither incorporated nor maintains its principal place of business in a state, mere contacts, no matter how 'systematic and continuous,' are

13

extraordinarily unlikely to add up to an 'exceptional case.'" *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 629 (2d Cir. 2016); *see also Aybar v. Aybar*, 169 A.D.3d 137, 93 N.Y.S.3d 159, 169 (2d Dep't 2019) ("[P]ersonal jurisdiction [under CPLR 301] cannot be asserted against a foreign corporation based solely on the corporation's continuous and systematic business activity in New York."), *aff'd*, 37 N.Y.3d 274, 156 N.Y.S.3d 104, 177 N.E.3d 1257 (2021).

Lim does not dispute that No. 8 is incorporated in Hong Kong, as is reflected in the No. 8 Endorsement Agreement he signed.  (*See* Ex. 2 at 1 (stating that No. 8 is "a Hong Kong company"); *see also* Li Decl. ¶ 2 (affirming that No. 8 "is incorporated in Hong Kong")).  Nonetheless, Lim argues that No. 8 is "at home" in New York, and therefore subject to general jurisdiction, because it "purports to be a foreign corporation but operates its headquarters and principal place of business in New York." (Am. Compl. ¶¶ 12-13).

Specifically, Lim claims that No. 8 only maintains its registration in Hong Kong because it is funded by a "silent investor" based in Hong Kong, Frederick Li. (*Id.* ¶¶ 7-8).  Despite No. 8's place of incorporation, Lim contends, all operational and managerial decisions are "made exclusively by Koon, from Koon's office—No. 8's headquarters—at 1 Lexington Avenue, Bethpage, New York 11714." (*Id.*). According to Lim, at all relevant times, Koon controlled and operated No. 8 (as well as Defendant BLING and non-party Tykoon) out of this purported New York headquarters, and these companies are merely his "alter egos."  (*Id.* ¶¶ 1, 14).  The Amended Complaint also includes a screenshot from No. 8's official Instagram

account describing No. 8 as a "New York City Avant-garde Fine Jewelry" brand. (*Id.* ¶ 9).[3]

Directly contradicting Lim's allegations, No. 8 submits a declaration from Li, its Managing Director, asserting that No. 8's principal place of business is Hong Kong, where its headquarters is located, where all its employees work, and where all its managerial and operational decisions are made (at the same address listed in the No. 8 Endorsement Agreement). (No. 8 Mot. at 2; Li Decl. ¶¶ 3-6; Ex. 2 at 1). Li states that No. 8 is based solely in Hong Kong, and that it transacts no business, is not contracted to supply goods or services, and possesses no interest in real property in New York. (No. 8 Mot. at 3; Li Decl. ¶¶ 10-14). Li also asserts that No. 8 "observes all appropriate 'corporate formalities'" (Li Decl. ¶ 7), contrary to Lim's allegation that it does not (Am. Compl. ¶ 15).

Li asserts further that No. 8 "does not share any headquarters, employees, officers, members of any boards of directors with defendants Koon or BLING, or with non-party Tykoon." (No. 8 Mot. at 2; Li Decl. ¶ 7). Li states that Koon "runs his own company, Tykoon, in New York, and provides services to No. 8, but he has no authority to make corporate decisions on No. 8's behalf." (No. 8 Mot. at 3; Li Decl. ¶ 9). Li does not, however, dispute that Koon is No. 8's Creative Director, as

---

[3] In substance, without using the term or citing the case, Lim argues that New York is the "nerve center" of No. 8's operations under the Supreme Court's test in *Hertz Corp. v. Friend,* 559 U.S. 77, 80–81 (2010). Under the nerve center test, the principal place of business is "where a corporation's officers direct, control, and coordinate the corporation's activities." *Id.* at 92–93. The nerve center is defined by a corporation's "actual center" of "direction, control, and coordination" where "high-level" decisions are made, rather than where day-to-day activities are managed. *Id.* at 93.

stated in the No. 8 Endorsement Agreement, or that Koon was authorized to sign the No. 8 Endorsement Agreement on behalf of No. 8.

As becomes immediately apparent from the foregoing, No. 8's motion is largely premised on factual disputes with Lim's assertions in the Amended Complaint.  No. 8 argues that all Lim has offered are "bald and unsupported allegations" (No. 8 Rep. at 1) that are "unsworn, baseless and wholly speculative" (*id.* at 2) and dispelled by the "sworn and specific facts provided by No. 8 that amply demonstrate there is no basis to exercise long-arm jurisdiction over it" (*id.* at 3).  In contrast, Lim, who submitted no affidavits in support of his contention that No. 8's principal place of business is New York, argues that the Court "should give little stock to" Li's sworn statements and that the allegations of the Amended Complaint are sufficient to make out a *prima facie* case of general jurisdiction.  (No. 8 Opp. at 4, 6).

Resolving this type of dispute on a Rule 12(b)(2) motion can be challenging. While the Second Circuit has stated that the jurisdictional allegations in the plaintiff's complaint "'must be taken as true *to the extent they are uncontroverted by the defendant's affidavits*,'" *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727-28 (2d Cir. 2012) (quoting *Schiffahrtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala,* 989 F.2d 572, 580 (2d Cir. 1993) (emphasis added)), it has also made clear that, prior to discovery, "the plaintiff's *prima facie* showing may be established solely by allegations," *Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir. 1990), and that, until an evidentiary hearing, "'a *prima*

16

*facie* showing suffices, *notwithstanding any controverting presentation by the moving party,* to defeat the motion [to dismiss],'" *Dorchester*, 722 F.3d at 86 (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)) (emphasis in *Dorchester*).  In *Dorchester*, the Second Circuit specifically rejected decisions from this District relying on the principle that "where a defendant rebuts a plaintiff's unsupported allegations with direct, highly specific testimonial evidence regarding a fact essential to jurisdiction—and the plaintiff does not counter that evidence— the allegation may be deemed refuted," reasoning that such a principle would be "inconsistent with the framework set forth in *Ball*."  *Id.* (citations omitted).  Still, as noted, the plaintiff's allegations must be "factually supported" and not merely "conclusory."  *Pearson Educ.*, 2020 WL 3547217, at *3.[4]

Ultimately, it is unnecessary for the Court to decide whether the allegations in Lim's pleading are sufficient to make out a *prima facie* case of general jurisdiction in the face of the sworn statements in Li's declaration.  As set forth below, Lim alleges facts, not controverted by No. 8, that clearly establish a *prima facie* case of specific jurisdiction.  The Court therefore need not (and does not) resolve the parties' dispute concerning whether No. 8 is subject to general jurisdiction in New York.

---

[4] A district court has "considerable procedural leeway" in deciding a pretrial motion to dismiss for lack of personal jurisdiction: "[i]t may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion."  *Dorchester*, 722 F.3d at 84.  Neither Lim nor No. 8 has requested jurisdictional discovery or an evidentiary hearing.

### b. Specific Jurisdiction

In contrast to general jurisdiction, which "permits a court to exercise its power in a case where the subject matter of the suit is unrelated to" the defendant's contacts with the forum, "[s]pecific [personal] jurisdiction exists when 'a [forum] exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum.'" *In re Terrorist Attacks*, 714 F.3d at 673-74 (quoting *Metro. Life Ins. Co.*, 84 F.3d at 567-68) (alterations in original). In other words, "[s]pecific jurisdiction covers defendants less intimately connected with a State, but only as to a narrower class of claims. To be subject to that kind of jurisdiction, the defendant must take 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State.'" *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 352 (2021) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)) (alteration in original). There must be "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear,* 564 U.S. at 919 (cleaned up).

In claiming that No. 8 is subject to the Court's specific jurisdiction, Lim relies on CPLR 302(a)(1), which provides that, as to a cause of action arising from an act enumerated therein, "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state[.]" N.Y. CPLR § 302(a)(1). (*See* Am. Compl. ¶ 17; No. 8 Opp. at 7-8). "'To establish personal

jurisdiction under section 302(a)(1), two requirements must be met: (1) [t]he defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity.'" *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013) (quoting *Solé Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006)).[5]

### i. Transacting Business

As to the first requirement, the Second Circuit has explained that a non-domiciliary transacts business within the meaning of CPLR 302(a)(1) "when [it] purposefully avails [itself] of the privilege of conducting activities within New York, thus invoking the benefits and protections of its laws." *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986) (citation omitted). This inquiry turns on the quality of the defendant's contacts with New York. *Licci*, 732 F.3d at 168. A single transaction is sufficient to confer jurisdiction under CPLR § 302(a)(1), "so long as the relevant cause of action also arises from that transaction." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 787 (2d Cir. 1999).

Importantly for this case, it has long been established that "[t]he non-domiciliary defendant need not have been physically present in New York to have

---

[5] Lim's opposition brief also invokes CPLR 302(a)(3), which confers jurisdiction over a non-domiciliary who "commits a tortious act without the state causing injury to person or property within the state … if [the corporation] expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." N.Y. CPLR § 302(a)(3). (*See* No. 8 Opp. at 7). This provision of the long-arm statute is inapplicable, however, as it requires, *inter alia*, that "the defendant committed a tortious act outside [New York]," *Penguin Group (USA) Inc. v. American Buddha*, 609 F.3d 30, 35 (2d Cir. 2010), and Lim identifies no tortious act committed by No. 8. His sole claim against No. 8 is for breach of contract.

transacted business for purposes of CPLR § 302(a)(1); it is sufficient if the defendant's agent is present and engages in purposeful activity on his behalf." *Uniroyal, Inc. v. Heller*, 65 F.R.D. 83, 91 (S.D.N.Y. 1974). In other words, "[t]he doctrine of agency permits personal jurisdiction to lie where the defendant's agent transacts business in the forum state for the defendant's benefit." *Cedric Kushner Prods., Ltd. v. Thobela*, No. 93 Civ. 4592 (PKL), 1994 WL 163992, at *3 (S.D.N.Y. Apr. 22, 1994). The statutory text, which confers jurisdiction over a non-domiciliary who transacts business in New York either "in person *or through an agent*," makes this abundantly clear. *See* N.Y. CPLR § 302(a)(1) (emphasis added).

"To establish an agency relationship for purposes of personal jurisdiction, a plaintiff must show that the alleged agent 'acts for the benefit of, and with the knowledge and consent of, the non-resident principal, and over which that principal exercises some control.'" *Bidonthecity.com LLC v. Halverston Holdings Ltd.*, No. 12 Civ. 9258 (ALC) (MHD), 2014 WL 1331046, at *4 (S.D.N.Y. Mar. 31, 2014) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. BP Amoco P.L.C.*, 319 F. Supp. 2d 352, 360 (S.D.N.Y. 2004)). The Amended Complaint alleges that No. 8 transacted business in New York itself and "through its agents" (Am. Compl. ¶¶ 17.c, 18), and pleads facts sufficient to show that Koon acted as No. 8's agent in entering into the No. 8 Endorsement Agreement with Lim. The No. 8 Endorsement Agreement recites that No. 8 is a brand and manufacturer of jewelry designed by Koon, identifies Koon as No. 8's Creative Director, and is signed by Koon on behalf of No.

8, committing No. 8 to perform the obligations specified in the Agreement.  (*Id.* ¶ 33; Ex. 2 at 1, 5).

No. 8 does not dispute that Koon was acting on its behalf and for its benefit, or that it is bound by the Agreement that Koon signed.  To the contrary, Li's assertion that Koon "must . . . seek and receive authorization from No. 8 management in Hong Kong before taking any actions on behalf of, or that might benefit, No. 8" (Li Decl. ¶ 9) tacitly acknowledges that No. 8 authorized Koon to sign the No. 8 Endorsement Agreement on its behalf.  No. 8's relationship with Koon bears all the hallmarks of an agency relationship: benefit, knowledge, consent, and control.  Thus, even assuming, as No. 8 contends, that No. 8 is a validly constituted separate corporate entity that is controlled by its management in Hong Kong, rather than by Koon as his alter ego, Lim's allegations and No. 8's admissions show that, at a minimum, Koon acted as No. 8's agent.

Lim also sufficiently alleges that Koon acted as No. 8's agent in New York. The Amended Complaint pleads that Koon resides in New York (Am. Compl. ¶¶ 2, 12), operates his business affairs from New York (*id.* ¶¶ 2, 12), and makes decisions for No. 8 from New York (*id.* ¶ 8); *see also* Ex. 1 at 1 and Ex. 5 at 1 (identifying Koon's and BLING's offices as located at 1 Lexington Avenue, Bethpage, NY).  The Amended Complaint also alleges that Koon executed the No. 8 Endorsement Agreement in New York.  (Am. Compl. ¶ 17.b).  In addition, Lim alleges that Koon engaged in pre-Agreement discussions with Lim (*id.* ¶¶ 25-26), negotiated and oversaw the drafting of the Agreement (*id.* ¶ 34; No. 8 Opp. Ex. 1 at 2-5), and

performed obligations of No. 8 under the Agreement (*see* No. 8 Opp. Ex. 1 (text messages in which Koon states he will provide No. 8 products to be worn on Bling Empire, as No. 8 was obligated to do under Section 5(a) of the Agreement)).  Koon presumably did these things in whole or in part in New York, given that New York is where he was based.  No. 8 contests none of these facts on this motion.

These activities are more than sufficient to constitute a *prima facie* showing that No. 8 transacted business in New York through Koon, its agent, for purposes of CPLR 302(a)(1).  *See, e.g.*, *Nat'l Union Fire Ins. Co.*, 319 F. Supp. 2d at 359 (New York agent's negotiation, execution, and other acts in connection with contract in question "more than suffice[d]" to establish personal jurisdiction over foreign defendant); *Fashion Fragrance & Cosm.s v. Croddick*, No. 02 Civ. 6294 (WK), 2003 WL 342273, at *4 (S.D.N.Y. Feb. 13, 2003) (relevant criteria in determining if a defendant has transacted business in New York include, *inter alia*, "whether the contract was negotiated or executed in New York," "the physical presence of the defendant in New York," and "the performance of the contract in New York"); *Ivens Stanton Assocs., Inc. v. Nor-Quest Res., Ltd.*, 195 A.D.2d 314, 600 N.Y.S.2d 39, 40 (1st Dep't 1993) ("Plaintiff's allegations of negotiation of a contract in New York by an agent, if proved, would be sufficient to support in personam jurisdiction in New York.").  Moreover, Section 7 of the No. 8 Endorsement Agreement contains a New York choice-of-law clause, which is another "factor weighing towards specific

personal jurisdiction." *Everything Yogurt Brands, LLC v. Bianco*, No. 23 Civ. 1161 (LJL), 2024 WL 3497757, at *6 (S.D.N.Y. July 22, 2024).[6]

Because Koon, as No. 8's agent, plainly transacted business in New York, Li's protestations that "No. 8 does not transact, and has not transacted, any business in New York" and that "I have not been in New York since No. 8 was formed" (Li Decl. ¶¶ 11, 17) are unavailing. *See Parke-Bernet Galleries, Inc. v. Franklyn*, 26 N.Y.2d 13, 308 N.Y.S.2d 337, 342, 256 N.E.2d 506 (1970) ("The mere fact that the defendant was able to arrange to conduct his extensive and purposeful activity in New York without having to physically come here does not enable him to avoid the jurisdiction of our courts."). Accordingly, the first requirement for long-arm jurisdiction under CPLR 302(a)(1) is satisfied.

### ii. Arising From

The second requirement—that the claim asserted must arise from the business transacted in New York—is also satisfied. A claim arises from or relates to a defendant's New York activity when there is "'some articulable nexus between the business transacted and the cause of action sued upon'" or a "'substantial

---

[6] The Court recognizes that the New York choice-of-law clause "is not enough on its own to show that Defendants purposefully availed themselves of the privilege of conducting activities within New York," *Everything Yogurt Brands*, 2024 WL 3497757, at *6, and does not rely on it as such. Consequently, the Court also attaches little significance to the declaration submitted by No. 8 from Ronald L. Monterosso, the American lawyer who drafted the No. 8 Endorsement Agreement, explaining why he decided to include this provision in the Agreement and denying that he did so "because of any perceived connection" between No. 8 and New York. (Monterosso Decl. ¶ 7). More significantly for purposes of this motion, Monterosso does not deny Lim's allegation and documentary evidence indicating that Koon, operating from New York, is the one who retained Monterosso to prepare the Agreement on behalf of No. 8. (Am. Compl. ¶ 34; No. 8 Opp. Ex. 1 at 2 (Koon text stating that "[m]y lawyer" will be drafting the Agreement)). Nor does Li make any claim in his declaration that he, rather than Koon, was responsible for retaining Monterosso or negotiating the No. 8 Endorsement Agreement.

relationship between the transaction or the claim asserted.'" *Solé Resort,* 450 F.3d at 103 (citations omitted).  Here, there is a direct and substantial nexus between the two: the business transacted was the negotiation, execution, and performance of the No. 8 Endorsement Agreement, and Lim's sole claim against No. 8 is for breach of that Agreement.  *See Gianino v. Panacya, Inc.*, No. 08 Civ. 1584 (SHS), 2000 WL 1224810, at *6 (S.D.N.Y. Aug. 29, 2000) (second requirement satisfied where plaintiff alleged that "the very contract breached by" defendants was "negotiated, finalized and partially performed in New York").

### c. Constitutional Due Process

Finally, exercising specific personal jurisdiction over No. 8 also comports with constitutional due process principles.  "Where, as here, jurisdiction is appropriate under Section 302(a), due process requirements are presumed to be satisfied." *Edmar Fin. Co., LLC v. Currenex, Inc.*, No. 21 Civ. 6598 (LAK), 2024 WL 3027877, at *3 (S.D.N.Y. June 17, 2024); *see Licci*, 732 F.3d at 170 ("It would be unusual, indeed, if a defendant transacted business in New York and the claim asserted arose from that business activity within the meaning of section 302(a)(1), and yet, in connection with the same transaction of business, the defendant cannot be found to have purposefully availed itself of the privilege of doing business in the forum and to have been able to foresee being haled into court there, or the assertion of specific jurisdiction would somehow otherwise offend traditional notions of fair play and substantial justice.") (cleaned up).

24

No. 8 (again, assuming *arguendo* that it is not simply Koon's alter ego) willingly associated itself with Koon, knowing that Koon was based in New York and would be conducting business from New York on No. 8's behalf.  Koon, acting in New York and with No. 8's authorization, proceeded to enter into the No. 8 Endorsement Agreement, which No. 8 is now alleged to have breached.  Surely it was foreseeable to No. 8 that it could be haled into a New York court to litigate a dispute over a contract that was negotiated, executed, and performed in part in New York by its agent and that contains a New York choice-of-law clause.  Under these circumstances, the Court cannot say it would offend principles of fair play and substantial justice to require No. 8 to litigate Lim's breach of contract claim in New York.  *See Nat'l Union Fire Ins. Co.*, 319 F. Supp. 2d at 364-67 (where foreign companies made "deliberate choice" to use New York agent to negotiate and execute contract and did not contend that agent "acted *ultra vires* its authority" or that agent's "New York acts do not suffice to bind them" to contract, requiring companies to litigate in New York can "hardly be deemed unfair" for due process purposes).

Accordingly, Lim has met his burden of establishing a *prima facie* case of specific jurisdiction over No. 8.  As a result, No. 8's motion to dismiss under Rule 12(b)(2) must be denied.

### 2.  Service of Process

No. 8 argues that the Court still cannot exercise jurisdiction over it because Lim failed to properly serve No. 8.  (No. 8 Mot. at 6-7).  Specifically, No. 8 argues that Lim's service must comply with the requirements of the Hague Convention

given that No. 8 is located in Hong Kong, a signatory of the Hague Convention under China's sovereignty.[7]  (*Id.*).   Instead, No. 8 contends, Lim has improperly purported to serve an individual in New York "who has no connection with it."  (*Id.* at 6).  The Court finds No. 8's argument to be well-founded.

Lim served the initial summons and Complaint on Jung Yang at 1 Lexington Avenue, Bethpage, NY, 11714, on October 10, 2024.  (No. 8 Mot. at 3; *see* Dkt. No. 14 (summons return executed)).  Process server Vincent J. Manetta's affidavit of service describes Yang as a "managing agent" of No. 8.  (Dkt. No. 14), but nothing in any of Lim's filings provides any basis for such an assertion.  Li, No. 8's Managing Director, asserts to the contrary that "[he does] not know, and No. 8 does not employ, anyone named Jung Yang.  No person by that name, or any other, has ever been authorized or designated by No. 8 or anyone else to receive or to accept service of legal documents on No. 8's behalf in New York or elsewhere."  (Li Decl. ¶ 17).

Lim's opposition asserts that Yang is "an employee of Tykoon, another entity controlled by Koon and located at the same address as No. 8 in New York."  (No. 8 Opp. at 10).  Lim alleges that Tykoon, BLING, and No. 8 shared "not only the same headquarters but also the same employees, officers, directors, raw materials, factories, and showrooms."  (Am. Compl. ¶ 15).  This is the extent to which Lim asserts any specific relation between Yang and No. 8.  As noted above, Li denies

---

[7] Hong Kong became a signatory to the Hague Convention as an extension of the United Kingdom when Hong Kong was under British rule, and later as an extension of the People's Republic of China ("PRC") when it came under the PRC's sovereignty.  The Hague Convention continues to be applicable to Hong Kong under the PRC's sovereignty, but the limitations and restrictions imposed by the PRC regarding service do not extend to Hong Kong.  *Henry Haining Zhang v. Kon Ki Lo*, No. 14 Civ. 6945 (CM), 2020 WL 2133163, at *4 (S.D.N.Y. May 5, 2020).

that Tykoon shares "any headquarters, employees, officers or members of any
boards of directors" with No. 8. (Li Decl. ¶ 7). Given the absence of any explanation
for the affidavit of service's labeling Yang a "managing agent," the Court is left only
with the bare assertion that Yang is an employee of Tykoon, a company allegedly
under common control with No. 8.

A foreign or domestic corporation may be served in a judicial district in the
United States "by delivering a copy of the summons and of the complaint to an
officer, a managing or general agent, or any other agent authorized by appointment
or by law to receive service of process." Fed. R. Civ. P. 4(h)(1)(B). Courts in this
District have construed this requirement liberally, allowing service through a
reasonable method even if the recipient does not strictly fall within the statutory
language. *See, e.g., Actava TV, Inc. v. Joint Stock Co. "Channel One Russia
Worldwide"*, 412 F. Supp. 3d 338, 350 (S.D.N.Y. 2019) (holding that service upon a
person who presented herself as the defendant's marketing manager and claimed
authority to accept service was adequate); *Kuhlik v. Atl. Corp., Inc.*, 112 F.R.D. 146,
148 (S.D.N.Y. 1986) (holding that service on corporate receptionist who claimed
authority to accept service was sufficient); *Montclair Elecs., Inc. v. Electra/Midland
Corp.*, 326 F. Supp. 839, 842 (S.D.N.Y. 1971) ("Generally, service is sufficient when
made upon an individual who stands in such a position as to render it fair,
reasonable and just to imply the authority on his part to receive service.").

Despite the liberal construction of Rule 4(h), courts in this District have
consistently held that service is only sufficient when the person served is in fact

affiliated with the defendant corporation and either is authorized or reasonably appears authorized to accept service. *See Ins. Co. of N. Am. v. S/S Hellenic Challenger*, 88 F.R.D. 545, 547 (S.D.N.Y. 1980) (service is not limited to "officially designated" officers or agents but may be made "upon a representative so integrated with the organization that he will know what to do with the papers." (citation omitted)). Service has been deemed insufficient when a plaintiff fails to demonstrate any connection between the person served and the defendant, even when service occurred at the defendant's place of business. *See Am. Inst. of Certified Pub. Accs. v. Affinity Card, Inc.*, 8 F. Supp. 2d 372, 374-77 (S.D.N.Y. 1998) (holding that service on the Vice President of another corporation which shared an office with the defendant, and who did not represent himself as authorized to accept service on behalf of the defendant, was insufficient).

Accordingly, even assuming, *arguendo*, that No. 8 and Tykoon are both controlled by Koon and share the same business address (*see* No. 8 Opp. at 10), service on Yang still does not satisfy Rule 4(h)(1)(B). Lim has alleged nothing, in his opposition or otherwise, which suggests that Yang was authorized to accept service on No. 8's behalf, or that it would have been reasonable to assume that Yang was authorized to accept such service. Lim does not allege that Yang represented that he was authorized to accept service for No. 8. Nor does Lim allege that Yang was an employee of No. 8 or identified himself as such. And even if Lim had made such an allegation, that would not establish that Yang was an officer, managing or general agent, or other agent authorized to accept service. *See Foley v. Capital One,*

*N.A.*, No. 25 Civ. 1526 (VB) (RWL), 2025 WL 958758, at *3 (S.D.N.Y. Mar. 31, 2025)
("'[T]he phrase "managing or general agent" does not refer to any agent of the
corporation, but one who operates at its highest levels, or at least has overall
authority to make high-level decisions on the part of the enterprise.'" (quoting
*Cooney v. Barry School of Law*, 994 F. Supp. 2d 268, 270 (E.D.N.Y. 2014))).

Further, the affidavit of service's conclusory and unexplained assertion that
the process server "knew" Yang to be a "managing agent" for No. 8 (Dkt. No. 14) is
insufficient to establish proper service under Rule 12(b)(5).  *See, e.g.*, *McHale v.
Chase Home Fin. LLC*, No. 17 Civ. 6089 (JMA) (AYS), 2020 WL 7711826, at *3-4
(E.D.N.Y. Dec. 29, 2020) (finding service defective even though affidavit of service
stated defendant's "Managing Agent" was served; "[w]hile an affidavit of a process
server ordinarily creates a presumption of proper service, the affidavit of service
[here] is simply too conclusory to create a presumption of proper service"); *Feng Lin
v. Quality Woods, Inc.*, No. 17 Civ. 3043 (DLI) (SJB), 2019 WL 1450746, at *5
(E.D.N.Y. Jan. 28, 2019) (holding insufficient averment in pre-printed form affidavit
of service that process server "knew said individual to be a managing agent" of
defendant, as "[h]ow the deponent knew that [the individual] was authorized to
accept service and was an actual 'managing agent' is never stated").

Accordingly, the Court finds that Lim has failed to meet his burden of
showing that service of the summons and Complaint on Yang was adequate service
on No. 8.  In its discretion, the Court elects to quash service rather than dismiss the
case as against No. 8.  Lim is directed to properly effect service on No. 8 within

ninety (90) days.  *See Vega*, 339 F.R.D. at 222 (quashing defective service on foreign

defendants rather than dismissing complaint); 5B Wright & Miller, *Fed. Prac. &*

*Proc. Civ.* § 1354 (4th ed. 2025 update) ("The federal courts have broad discretion to

dismiss the action or to retain the case but quash the service that has been made on

the defendant. . . . [S]ervice generally will be quashed and the action preserved in

those situations in which there is a reasonable prospect that the plaintiff ultimately

will be able to serve the defendant properly.").

### B.  Koon and BLING's Motion to Dismiss

The Court next turns to Koon and BLING's motion to dismiss Counts 4, 5,

and 6 pursuant to Rule 12(b)(6) and (with respect to Count 5) Rule 9(b).

#### 1.  Count 4: Fraudulent Inducement

Under New York law,[8] to plead a claim for fraudulent inducement, a plaintiff

must allege the following elements: (1) a material misrepresentation or omission of

fact, (2) defendant's knowledge of falsity, (3) defendant's intention to induce

reliance, (4) reasonable reliance by the plaintiff, and (5) resulting injury or

damages.  *AT&T Corp. v. Atos IT Sols. & Servs., Inc.*, 714 F. Supp. 3d 310, 329

(S.D.N.Y. 2024).  The fifth element requires further that the plaintiff establish a

causal connection between the injury suffered and the defendant's fraudulent

inducement.  "To establish causation, a plaintiff must show both that the

defendant's misrepresentations induced the plaintiff to engage in the transaction in

---

[8] As the parties rely only on New York cases for their arguments concerning Lim's fraudulent inducement and fraud claims, the Court assumes that New York law applies to those claims.

question (transaction causation) and that the misrepresentations directly caused the loss about which the plaintiff complains (loss causation)." *Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, 151 A.D.3d 83, 86, 56 N.Y.S.3d 21 (1st Dep't 2017) (cleaned up), *aff'd*, 31 N.Y.3d 569, 81 N.Y.S.3d 816, 106 N.E.3d 1176 (2018).

Lim's fraudulent inducement claim alleges that he was injured by Koon and BLING's conduct in two ways: (1) Lim's investment was "squandered" by Koon and BLING, and (2) Lim's reputation was "substantially injured in an amount to be determined at trial." (Am. Compl. ¶ 125). Koon and BLING argue that Lim's allegations as to each injury are insufficient as a matter of law. (K&B Mot. at 7-8). The Court considers each in turn.[9]

### a. Loss of Investment

Lim alleges that Koon and BLING's misrepresentations—specifically, that "10% of all of the then-prospective brand's sales would be donated to charitable causes that would be agreed upon between both Lim and Koon at a later date" (the "Charity Promise")—induced Lim to sign the BLING Shareholders' Agreement and invest over $100,000 to launch BLING. (Am. Compl. ¶¶ 122-23). Contrary to these representations, Lim alleges, Koon and BLING never had "[any] intention of donating 10% of all of BLING's sales to charitable causes." (*Id.* ¶ 124).

---

[9] In his opposition, Lim suggests without elaboration that he is seeking an additional form of damages on his fraudulent inducement claim, arguing that "defendants' fraud prevented him from fully realizing the benefits of the contracts, such as receiving his royalty payments and commissions[.]" (K&B Opp. at 5-6). The Court disregards this argument, both because the Amended Complaint does not plead such damages on Count 4 (*see* Am. Compl. ¶ 125), and because "damages are to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained." *Coughlan v. Jachney*, 473 F. Supp. 3d 166, 197 (E.D.N.Y. 2020) (citation omitted).

Koon and BLING argue that, to the extent Lim claims injury from Koon and BLING's "squandering" of Lim's investment, that injury is not causally connected to the alleged misrepresentations concerning the Charity Promise. (K&B Mot. at 9-11). That is because (according to Koon and BLING) the alleged harm—the squandering of Lim's investment—"could only have possibly occurred *after*" the BLING Agreements were signed and Lim's investment was made. (*Id*. at 9-10 (emphasis in original)). In other words, while Lim may have been induced to enter into the BLING Agreements on the basis of Koon and BLING's alleged misrepresentations, the subsequent squandering of Lim's investment was not an injury caused by these misrepresentations. (*Id*.).

The Court rejects this argument because it ignores Lim's well-pleaded allegations. Specifically, the Amended Complaint pleads that from the time of "BLING's inception in April 2022, Koon used BLING to perpetuate his fraudulent scheme on Lim"; that Koon intended from the outset to "operate[] BLING as a sham corporation to siphon Lim's investment funds for illicit and improper purposes"; and that Koon began siphoning Lim's investment funds "almost immediately" after receiving them. (Am. Compl. ¶ 99). These allegations, which must be taken as true on this motion, belie Koon and BLING's attempt to sever the connection between the alleged misrepresentations concerning donations to charity, on the one hand, and the alleged loss of Lim's investment, on the other. As alleged in the Amended Complaint, those actions were part of a single fraudulent scheme and there is a direct causal connection between the two. In essence, Lim claims that Koon and

BLING fraudulently induced Lim to invest his funds *to enable* Koon and BLING to misappropriate the funds.

This is an adequate allegation of causation at the pleading stage. A plaintiff with a valid fraudulent inducement claim may recover its "out of pocket" damages, measured by "the difference between the value of the bargain it was fraudulently induced to make and the value of the consideration exacted as the price of the bargain." *Myers Indus., Inc. v. Schoeller Arca Sys., Inc.*, 171 F. Supp. 3d 107, 123 (S.D.N.Y. 2016). If, as Lim alleges, Koon and BLING intended at the time of his investment to divert his funds for non-BLING purposes, then the 20% interest he acquired in BLING was worth less than what he paid for it. Whether the alleged misrepresentations caused the loss of his entire capital contribution, or some other amount, is a question of fact that is not properly resolved at the pleading stage. *See Syncora Guar. Inc. v. Macquarie Secs. (USA) Inc.*, 164 A.D.3d 1141, 84 N.Y.S.3d 108, 108 (1st Dep't 2018) ("[Plaintiff] sufficiently alleges facts from which it can be inferred that it sustained damages arising from the alleged fraud. Any factual questions as to whether the damages it seeks to recover are identical to rescissory damages may not be resolved on this motion to dismiss." (citations omitted)).[10]

---

[10] Koon and BLING also argue that their "failure to honor" the alleged promise to donate 10% of BLING's revenues to charity would have only caused BLING's revenues to *increase* and thus could not have caused any monetary loss to Lim. (K&B Rep. at 3). But Lim's fraudulent inducement claim does not allege Lim was injured by Koon and BLING's "failure to honor" the Charity Promise. Rather, Lim alleges he was injured by Koon and BLING's *misrepresentation* (*i.e.*, the Charity Promise itself), which induced him to part with his money so that Koon and BLING could misappropriate it.

Accordingly, Koon and BLING's motion to dismiss Count 4 is denied with respect to Lim's claimed loss of his investment in BLING.

### b. Reputational Harm

Koon and BLING argue that the other injury alleged in Count 4—harm to Lim's reputation—is not cognizable under New York law.  (K&B Mot. at 11-13).  This is so, they contend, for two reasons: first, because "New York does not recognize any cause of action for loss of reputation other than a claim for defamation" and, second, because Lim must be able to show "actual pecuniary loss." (K&B Mot. at 11-12).  Notably, while reiterating his allegation that he suffered reputational harm, Lim fails to meaningfully address these legal arguments in his opposition.  (K&B Opp. at 7).  Nonetheless, the Court will independently evaluate them.

Koon and BLING's first argument is misguided.  While New York law places restrictions on claims seeking damages for injuries to reputation, the line of cases invoked by Koon and BLING applies to claims that seek *only* damages for harm to reputation.  *See Hengjun Chao v. Mt. Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012) ("'New York law considers claims sounding in tort to be defamation claims . . . where those causes of action seek damages *only* for injury to reputation, or where the *entire* injury complained of by plaintiff flows from the effect on his reputation.'" (quoting *Jain v. Sec. Indus. and Fin. Mkts. Ass'n,* No. 08 Civ. 6463 (DAB), 2009 WL 3166684, at *9 (S.D.N.Y. Sept. 28, 2009)) (emphasis added)); *see also Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 324-25 (S.D.N.Y. 2012) (relying on this principle

34

in dismissing standalone claim for "harm to professional reputation"); *Baum v. Phillips, Appel & Walden, Inc.*, 648 F. Supp. 1518, 1537 (S.D.N.Y. 1986) (similarly holding that plaintiff "has not stated a valid claim for 'loss of reputation'"). This is plainly not the case in the instant action, as Lim is asserting a fraud claim, not a claim for harm to reputation, and is seeking damages based on the loss of his investment in addition to reputational harms.

However, Koon and BLING's second argument has merit. As pled, the alleged injury is not pecuniary in nature, as required under New York law's out-of-pocket rule which applies to damages claimed for fraudulent inducement. Under that rule, "a plaintiff alleging fraudulent inducement is limited to 'out of pocket' damages, which consist solely of the actual pecuniary loss directly caused by the fraudulent inducement[.]" *Kumiva Grp., LLC v. Garda USA Inc.*, 146 A.D.3d 504, 45 N.Y.S.3d 410, 413 (1st Dep't 2017). "[I]n applying the out-of-pocket rule, 'courts have barred recovery for lost profits, loss of customers, and injury to business reputation' for fraud and negligent misrepresentation claims." *Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd.*, 392 F. Supp. 3d 382, 398 (S.D.N.Y. 2019) (quoting *In re Optimal U.S. Litig.*, 837 F. Supp. 2d 244, 266 (S.D.N.Y. 2011)); *see also Power Auth. of N.Y. ex rel. Solar Liberty Energy Sys., Inc. v. Advanced Energy Indus., Inc.*, No. 19 Civ. 1542 (LJV) (JJM), 2023 WL 2756968, at *3-4 (W.D.N.Y. Feb. 1, 2023) (finding that fraudulent inducement claim should be dismissed to the extent it sought reputational damages, as such a claim "has no legal basis" under the out-of-pocket rule), *R&R adopted*, 2024 WL 957788 (W.D.N.Y.

35

Mar. 6, 2024); *Kulas v. Adachi*, No. 96 Civ. 6674 (MBM), 1997 WL 256957, at \*10 (S.D.N.Y. May 16, 1997) (rejecting a fraud claim premised upon injury to business reputation because it is not an out-of-pocket loss).

Therefore, Lim's claim for harm to his reputation is not a cognizable injury under a theory of fraudulent inducement. Accordingly, Koon and BLING's motion is granted as to Count 4 with respect to Lim's claimed reputational injuries.

### 2. Count 5: Fraud

Under New York law, a plaintiff must plead the following elements to state a claim for fraud: "(1) a material misrepresentation or omission of fact; (2) made by defendant with knowledge of its falsity; (3) and intent to defraud; (4) reasonable reliance on the part of plaintiff; and (5) resulting damage to the plaintiff." *Meda AB v. 3M Co.*, 969 F. Supp. 2d 360, 385 (S.D.N.Y. 2013).

Count 5 identifies three categories of alleged misrepresentations in connection with Lim's fraud claim. First, Lim alleges that Koon misrepresented that "BLING would be operated as a separate legal entity, distinct from not only Koon's other supposed brands but also from Koon himself" and that "BLING would maintain [its] own books and records, hire its own employees, operate from its own offices, and hire and maintain a board of directors to oversee the business" (the "Separation Representations"). (Am. Compl. ¶¶ 127-28). Second, Lim alleges that Koon misrepresented that he "would invest $300,000 of his own money into BLING" (the "Capital Contribution Representation"). (*Id.* ¶ 128). Third, Lim alleges that Koon misrepresented that he "had experience operating million-dollar brands and

36

working with 'A List' celebrities who had allegedly endorsed Koon's previous endeavors" (the "Experience Representation").  (*Id.* ¶ 129).[11]

Koon and BLING move to dismiss Count 5 on the grounds that Lim's fraud allegations (1) fail to satisfy the heightened pleading standard in Fed. R. Civ. P. 9(b) (K&B Mot. at 13-15), and (2) fail to adequately plead an entitlement to punitive damages or attorney's fees (*id.* at 15-16).

### a.  Rule 9(b)

"[A] claim for common law fraud under New York law must satisfy the requirements of the heightened pleading standard under Federal Rule of Civil Procedure 9(b)."  *Mantana v. Merkin*, 957 F. Supp. 2d 473, 484 (S.D.N.Y. 2013).  Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  To satisfy the heightened pleading standard, "a complaint alleging fraud ordinarily must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Miller v. United States*

---

[11] In responding to Koon and BLING's arguments directed at Count 5, Lim's opposition also relies on the Charity Promise, *i.e.*, Koon and BLING's alleged misrepresentation that 10% of BLING's revenues would be donated to charity.  (K&B Opp. at 6-7).  But Count 5 specifies the misrepresentations that constitute the alleged fraud, and it does not mention the Charity Promise. Instead, Lim chose to plead a fraudulent inducement claim based on the Charity Promise (Count 4), and a separate fraud claim based on other alleged misrepresentations (Count 5).  The Court therefore does not regard the Charity Promise as embraced within Count 5.

*ex rel. Miller*, 110 F.4th 533, 543-44 (2d Cir. 2024) (cleaned up).  The Court evaluates each alleged misrepresentation in light of these requirements.

### i.   Separation Representations

Lim has adequately particularized the "who, what, where, and when" required by Rule 9(b) for the alleged Separation Representations.  As noted in Lim's opposition (K&B Opp. at 6-7), these particulars are set forth in the exhibits to the Amended Complaint, and specifically the Shareholders' Agreement and Koon's BLING Proposal Email.  The Shareholders' Agreement provides for the establishment of BLING as a separate legal entity, distinct from Koon's other companies and Koon himself.  (Am. Compl. Ex. 1 §§ 1.1, 4.2-4.3).  Further, the Shareholders' Agreement provides for the establishment of a BLING Board of Directors (which was to consist initially of only Koon) and states that the Board will cause the company "to maintain the books, records, and other documents required by Delaware law" and will use commercially reasonable efforts to "run the business of the Corporation in accordance with Delaware law and sound business practices." (*Id.* §§ 3.1, 3.2.a, 3.2.b; *see also id.* § 1.5 (stating that the "Corporate books and records shall be kept at the Corporate Office")).  The Agreement, as well as the BLING Proposal Email, also state that Lim and Koon's capital contributions will be used to pay for, *inter alia*, "Salaries for Team Pro-rated by task," which suggests BLING would be hiring its own employees.  (*Id.* § 2.3; Am. Compl. Ex. 4 at 4).

Further, Lim alleges that BLING, No. 8 and Tykoon, while "ostensibly separate entities," are in fact "alter egos of Koon," controlled by Koon and sharing

management, personnel, property, headquarters, and assets.  (Am. Compl. ¶¶ 15-16).  Lim alleges further that Koon "failed to hold regular meetings, keep proper records, hire staff and/or employees dedicated to running BLING as a separate legal entity, elect a board of directors, and keep BLING's assets separate from Koon's own."  (*Id.* ¶ 116).  These allegations adequately suggest the falsity of the Separation Representations.

Whether Lim ultimately will be able to prove fraud based on the Separation Representations is, of course, a separate matter.  For example, given that the Shareholders' Agreement, to which Lim agreed, expressly provided for Koon to be the sole director of BLING and did not require the appointment of any other directors (*see id.* Ex. 1 § 3.1), it may be difficult for Lim to show that Koon fraudulently represented that he would "hire and maintain a board of directors to oversee the business."  (Am. Compl. ¶ 128).  Rule 9(b), however, is not designed to test the strength of a plaintiff's fraud claim; rather, "[t]he primary purpose of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based."  *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990).  The Amended Complaint affords Koon and BLING fair notice of Lim's claim with respect to the Separation Representations.

### ii.  Capital Contribution Representation

The same is true of the Capital Contribution Representation.  The Amended Complaint specifies where this representation was made: in the BLING Shareholders' Agreement, which reflects Koon's promised and obligatory initial

capital contribution of $326,400.  (Am. Compl. Ex. 1 § 2.1(a)).  The Amended
Complaint also explains the basis for claiming that this representation was false:
Lim alleges that "shortly after transferring his capital contribution of $326,400 to
BLING, Koon methodically and deliberately made several funds transfers whereby
he transferred his contribution back to his personal bank account, resulting in
BLING becoming severely undercapitalized."  (Am. Compl. ¶ 111).  These
allegations satisfy the pleading requirements of Rule 9(b), as they include a date, a
speaker, the content of the statement, and a factual basis for alleging it was false.

### iii.  Experience Representation

The Experience Representation merits a different analysis.  Neither the
Amended Complaint itself nor its exhibits specify where, when, or in what context
Koon "represented to Lim that [Koon] had experience operating million-dollar
brands and working with 'A-List' celebrities who had allegedly endorsed Koon's
previous endeavors."  (*Id.* ¶ 129).  Nor does the Amended Complaint set forth
grounds for believing that such a representation by Koon was false.  In fact, the
Amended Complaint does not appear to allege that the Experience Representation
*was* false.

Although addressed in Koon and BLING's motion, a review of the Amended
Complaint indicates that Lim does not, in fact, allege that the Experience
Representation is one of the misrepresentations supporting his fraud claim.  Rather,
after describing the Separation Representations, the Capital Contribution
Representation, and the Experience Representation (*id.* ¶¶ 127-29), the Amended

Complaint then alleges that Koon's "representations" were untrue because Koon "had always intended not only to use BLING as his alter ego but also to transfer his investment back to this personal bank account after he received Lim's investment." (*Id.* ¶ 130). That allegation pertains only to the Separation Representations and the Capital Contribution Representations. As for the Experience Representation, the Amended Complaint alleges only that it constituted a reason why "Lim's reliance" on Koon's other representations, *i.e.*, the Separation Representations and Capital Contribution Representation alleged in Paragraphs 127 and 128, was "reasonable"—not that the Experience Representation was untrue. (*Id.* ¶ 129).

Since the Experience Representation is not one of the material misrepresentations upon which Lim relies in asserting his fraud claim, but instead is only offered as a reason why Lim's reliance on Koon's representations was reasonable, it does not need to comply with Rule 9(b). Hence, Koon and BLING's Rule 9(b) motion is denied in its entirety.[12]

### b. Claims for Punitive Damages and Legal Fees

Koon and BLING argue that Lim's claims for punitive damages and legal fees related to his fraud claim must be dismissed because the alleged fraud "has its

---

[12] In their reply brief, Koon and BLING advance an additional challenge to Lim's fraud claim, arguing that Count 5 "fails to state a claim for fraud under New York law" because the Separation Representations and Capital Contribution Representation are duplicative of Lim's breach of contract claims. (K&B Rep. at 4-5). Because Koon and BLING did not include this ground for dismissal in their motion to dismiss, and raised it for the first time in reply, the Court declines to consider it. *See Pac. Life Ins. Co. v. US Bank Nat'l Ass'n*, 636 F. Supp. 3d 366, 422 n.57 (S.D.N.Y. 2022) ("Because [defendant's] arguments on this point are presented for the first time in reply, they will not be considered in connection with the instant motion to dismiss."); *Solomon v. Spring Corp.*, No. 19 Civ. 5272 (MKV), 2022 WL 889897, at *4 n.2 (S.D.N.Y. Mar. 25, 2022) ("[O]rdinarily the Court does not consider matters addressed for the first time in a reply brief.").

genesis in" the parties' contractual relationship and is not "aimed at the public" in the manner required for such an award under New York law.  (K&B Mot. at 15-16). Lim fails to address this argument in his opposition.

"Punitive damages are not recoverable for [fraudulent conduct associated with] an ordinary breach of contract as their purpose is not to remedy private wrongs but to vindicate public rights.  However, where the breach of contract also involves a fraud evincing a 'high degree of moral turpitude' and demonstrating 'such wanton dishonesty as to imply a criminal indifference to civil obligations,' punitive damages are recoverable if the conduct was . . . part of a pattern of similar conduct directed at the public generally."  *Rocanova v. Equitable Life Assur. Soc. of U.S.*, 83 N.Y.2d 603, 612 N.Y.S.2d 339, 342, 634 N.E.2d 940 (1994) (citations omitted).

In *Bloomfield Inv. Res. Corp. v. Daniloff*, No. 23-934, 2024 WL 3517850 (2d Cir. July 24, 2024), the Second Circuit explained that this rule—that punitive damages are not recoverable for breach of contract unless the defendant engages in conduct aimed at the public generally—applies "when-ever an action 'arises from' or 'has its genesis in' a contractual relationship between the parties."  *Id*. at *4 (quoting *N.Y. Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763, 767 (1995)).  As a result, the court reversed a punitive damages award on a fraudulent inducement claim where no finding had been made that the defendant's conduct was aimed at the public.  *Id*.

Wrongful conduct is "aimed at the public" when "[w]hat is asserted is not an isolated transaction incident to an otherwise legitimate business, but a gross and

wanton fraud upon the public," as when "defrauding the general public . . . is the very basis of the defendants' business," *Walker v. Sheldon*, 10 N.Y.2d 401, 223 N.Y.S.2d 488, 492, 179 N.E.2d 497 (1961), or when "the wrongdoing was of a continuous and systematic nature, aimed at the public generally," *Merrick v. Four Star Stage Lighting, Inc.*, 60 A.D.2d 806, 807, 400 N.Y.S.2d 543 (1st Dep't 1978). *See JD Produce Maspeth LLC v. State Farm Fire & Cas. Co.*, No. 23 Civ. 6637 (NGG) (LB), 2024 WL 5630618, at *6 (E.D.N.Y. Nov. 19, 2024) (discussing case law).

As discussed above, the Separation Representations and the Capital Contribution Representation, which are the alleged misrepresentations underlying the Count 5 fraud claim, are grounded in the Shareholders' Agreement, and so "ha[ve their] genesis," *Bloomfield*, 2024 WL 3517850, at *4, in the parties' contractual relationship.  As such, the claim for punitive damages premised upon these allegedly fraudulent misrepresentations must be supported by allegations that this conduct was part of a broader scheme aimed at defrauding the general public.  The Amended Complaint, however, contains no allegations to this effect. Lim alleges that BLING, No. 8, and Tykoon are shell companies that Koon "uses as his alter egos to perpetrate fraud to escape personal liability" (Am. Compl. ¶ 1), but nowhere does Lim allege that they were used to perpetrate a fraud on anyone other than himself, let alone the public generally.  While Lim alleges that the Charity Promise was a misrepresentation made to the public (*see id.* at ¶¶ 1, 80-81), that alleged misrepresentation does not form part of the fraud claim in Count 5,[13] and in

---

[13] The Charity Promise does underlie Lim's claim for fraudulent inducement in Count 4, but Count 4 does not seek an award of punitive damages, at least not explicitly, as Count 5 does.  (*See id.* at ¶¶

any event Lim does not allege that any member of the public was defrauded by it. In short, the wrongdoing alleged in the Amended Complaint fundamentally is conduct directed at Lim personally, not the public generally.

Accordingly, Lim's claim for punitive damages on Count 5 is dismissed. *See, e.g.*, *JD Produce Maspeth LLC*, 2024 WL 5630618, at *7 (granting motion to dismiss punitive damages claim because, *inter alia*, plaintiff "fail[ed] to allege that [defendant] engaged in egregious conduct that was part of a pattern directed at the public"); *Carling v. Peters*, No. 10 Civ. 4573 (PAE) (HBP), 2013 WL 865822, at *9 (S.D.N.Y. Feb. 6, 2013) (similar).

However, the Court will not dismiss the claim for attorney's fees in Count 5. Although the point heading in Koon and BLING's brief seeks dismissal of the attorney's fees claim, the ensuing argument presents no authority or reasoning in support of that request. (K&B Mot. at 15-16). The concluding sentence of the argument requests dismissal of Lim's claims in Count 5 for "punitive damages and attorney's fees," citing the Second Circuit's decision in *Bloomfield*. (*Id*. at 16). But *Bloomfield* does not so much as mention attorney's fees, and Koon and BLING point the Court to no authority applying the punitive damages rule discussed in *Bloomfield* to a claim for attorney's fees. This branch of Koon and BLING's motion directed at Count 5 is, therefore, denied.

---

121-25; *compare id*. ¶ 132). Presumably that is why Koon and BLING do not direct this part of their motion at Count 4. Nor does Lim's opposition argue that he seeks punitive damages on Count 4 or that Count 4 sufficiently alleges conduct aimed at defrauding the general public.

### 3.  Count 6: Good Faith and Fair Dealing

#### a.  Legal Principles

"New York law . . . recognizes an implied covenant of good faith and fair dealing in every contract."  *Knutson v. G2 FMV, LLC*, No. 14 Civ. 1694 (RWS), 2018 WL 286100, at *6 (S.D.N.Y. 2018).  This covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 639 N.Y.S.2d 977, 979, 663 N.E.2d 289 (1995) (cleaned up).  It requires each party to refrain from intentionally hindering the other's performance under the contract.  *Grad v. Roberts*, 14 N.Y.2d 70, 248 N.Y.S.2d 633, 637, 198 N.E.2d 26 (1964).

A breach of the covenant of good faith and fair dealing may be found "when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement."  *Prakhin v. Fulton Towers Realty Corp.*, 122 A.D.3d 601, 996 N.Y.S.2d 85, 88 (2d Dep't 2014).  However, in order to breach the covenant, "a party's action must 'directly violate an obligation that may be presumed to have been intended by the parties.'"  *Gaia House Mezz LLC v. State Street Bank and Trust Co.*, 720 F.3d 84, 93 (2d Cir. 2013) (quoting *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407-08 (2d Cir. 2006)).

A breach of the covenant of good faith and fair dealing is "'merely a breach of the underlying contract,'"  *Fasolino Foods Co., Inc. v. Banca Nizionale del Lavoro*,

961 F.2d 1052, 1056 (2d Cir. 1992) (citation omitted), and the duty of good faith applies only to "the performance of obligations expressly imposed by the underlying agreement." *Addax BV Geneva Branch v. Eastern of New Jersey, Inc.*, No. 05 Civ. 9139 (JSR), 2007 WL 945652, at *2 (S.D.N.Y. Mar. 29, 2007). The covenant "cannot be used to create independent obligations beyond the contract." *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 497 (S.D.N.Y. 2022); *see also Penske Media Corp. v. Shutterstock, Inc.*, 548 F. Supp. 3d 370, 376 (S.D.N.Y. 2021) (such "[i]mplied obligations may not include any term inconsistent with the terms of the contractual relationship and may not 'create duties which are not fairly inferable from the express terms of that contract'") (citation omitted).

"While independent obligations beyond those stated in the contract will not be inferred, a plaintiff adequately states an implied covenant claim by alleging conduct that subverts the contract's purpose without violating its express terms." *JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, No. 08 Civ. 9116 (PGG), 2009 WL 321222, at *5 (S.D.N.Y. Feb. 9, 2009). The covenant "only applies where an implied promise is so interwoven into the contract 'as to be necessary for effectuation of the purposes of the contract.'" *Thyroff*, 460 F.3d at 407 (quoting *M/A-Com Security Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)).

### b. Application

The Amended Complaint alleges that "Koon had represented to Lim that 10% of all of the then-prospective brand's sales would be donated to charitable causes that would be agreed upon between both Lim and Koon at a later date." (Am.

Compl. ¶ 122).  In support of Plaintiff's claim for breach of the implied covenant of good faith and fair dealing, Count 6 alleges that "[b]y failing to adhere to his promise to donate 10% of all BLING sales to charitable causes, Koon deprived Lim of fully realizing the benefits of the[] [BLING] Agreements.  To wit, the ability to promote Lim's investment BLING as a socially conscious, philanthropically-focused organization, which is a requirement for Lim before Lim invests in a business." (*Id.* ¶ 135).  While acknowledging that the Charity Promise "was not expressly provided for in any contractual agreement," Lim also asserts that it is not "contrary to any contractual provision of" the BLING Agreements.  (*Id.* ¶ 136).

Koon and BLING argue that implying such a promise *is* contrary to provisions of the BLING Agreements, namely, their merger clauses.  (K&B Mot. at 17-18).  The merger clause in the Shareholders' Agreement states that "[t]his document constitutes the entire agreement of the parties" and "correctly sets forth [their] rights, duties, and obligations." (Am. Compl. Ex. 1 § 11.6).  Similarly, the merger clause in the BLING Endorsement Agreement states that "[t]his Agreement constitutes the entire understanding and agreement between the parties" and that "[t]here are no other agreements" between them, "express or implied," other than as set forth in the agreement.  (*Id.* Ex. 5 § 10).  Plainly, these provisions would preclude Lim from introducing parol evidence of the Charity Promise in order to vary or modify the terms of the BLING Agreements.  *See, e.g.*, *Cerveceria Modelo, S.A. de C.V. v. USPA Accessories LLC*, No. 07 Civ. 7998 (HB), 2008 WL 3919186, at *1 (S.D.N.Y. Aug. 25, 2008) ("Where the parties have reduced their agreement to an

47

integrated writing, the parol evidence rule excludes evidence of all prior or contemporaneous negotiations, agreements or understandings offered to contradict, vary or modify the terms of their writing.").

Still—and as Koon and BLING acknowledge (K&B Mot. at 16; K&B Rep. at 9)—"the fact that the Agreements contained a merger clause does not require the dismissal of the Plaintiff's claim for breach of the implied covenant of good faith and fair dealing." *Dorset Industries, Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395, 407 (E.D.N.Y. 2012). That is because the implied covenant of good faith and fair dealing "'does not operate to create new contractual rights; it simply ensures that parties to a contract perform the substantive, bargained-for terms of their agreement and that parties are not unfairly denied express, explicitly bargained-for benefits.'" *LoanStreet, Inc. v. Troia*, No. 21 Civ. 6166 (NRB), 2023 WL 5836237, at *7 (S.D.N.Y. Sept. 8, 2023) (quoting *Oscar de la Renta, Ltd. v. Mulberry Thai Silks, Inc.*, No. 08 Civ. 4341 (RJS), 2009 WL 1054830, at *5 (S.D.N.Y. Apr. 17, 2009)). Thus, while the purpose of a merger clause "is to preclude consideration of matters extrinsic to the agreement," the clause does not apply "if the promise, albeit imperfectly expressed, is implicit in the contract as written." *Havel v. Kelsey-Hayes Co.*, 83 A.D.2d 380, 384, 445 N.Y.S.2d 333 (4th Dep't 1981).

The question remains whether Lim has plausibly alleged that a promise to donate 10% of BLING's revenues to charity is "implicit *in* the contract *as written*," *id*. (emphasis added), or "so interwoven *into the contract* as to be *necessary* for effectuation of the purposes *of the contract*," *Thyroff*, 460 F.3d at 407 (emphasis

added).  Koon and BLING argue that it is not and that, instead, Lim impermissibly invokes the covenant of good faith and fair dealing to create independent obligations that "go beyond" those intended and stated in the language of the BLING Agreements.  (K&B Mot. at 16, 19).  The Court agrees with Koon and BLING.

Both the Shareholders' Agreement and the BLING Endorsement Agreement are, as described by Lim, "commercial agreements" (Am. Compl. ¶ 1) that set forth the parties' respective economic rights and legal obligations relating to the BLING business that they had agreed to launch.  The terms of the Agreements encompass such matters as Lim and Koon's respective capital contributions, their ownership interests, and the royalties Lim would receive on sales of BLING products.  Nothing in either Agreement speaks to or contemplates any charitable purpose or intent.  So far as can be discerned from a reading of the Agreements, their purpose was strictly economic.  An obligation to donate a portion of BLING's revenues to charity, therefore, is not "fairly inferable from the express terms" of the BLING Agreements, *see Penske Media*, 548 F. Supp. 3d at 376, nor can such an obligation plausibly be deemed "necessary for effectuation of the purposes of the contract," *Thyroff*, 460 F.3d at 407.

Lim's counterarguments are unavailing.  Lim's opposition argues that Koon and BLING's failure to donate 10% of BLING's revenues to charity "frustrated the purpose of the BLING Shareholders' Agreement and the BLING Endorsement Agreement" (K&B Opp. at 8 (citing Am. Compl. ¶¶ 62, 118-20)), but the allegations of the Amended Complaint he cites to fail to plausibly suggest that this is the case.

Paragraph 62 alleges that BLING was intended to "leverage Lim's . . . commitment to philanthropic causes." (Am. Compl. ¶ 62). But if philanthropy was Lim's purpose, he failed to express it in the BLING Agreements. That is fatal to his ability to plead what is required: that the purpose *of the Agreements* required donations to charity. Paragraphs 118 to 120, which are part of the breach of contract claim against Koon and BLING, merely recite that Koon and BLING breached their obligation "to pay Lim a royalty equal to 5% of BLING's net sales" and thereby caused Lim "substantial financial damages." (*Id.* ¶¶ 118-20). But the fact that BLING was required to pay a percentage of its revenues to Lim in no way implies that BLING was also required to donate a percentage of its revenues to charity.

Lim also argues that the Chairty Promise was "consistent with the express terms of those contracts, such as the BLING Endorsement Agreement's provision that Lim would endorse and promote BLING as a socially conscious brand." (K&B Opp. at 9). Notably, Lim does not cite any provisions of the BLING Endorsement Agreement in support of this argument (instead, he again cites to Paragraphs 118-20 of the Amended Complaint, as well as Paragraph 132, which merely alleges Lim's damages on his fraud claim). A review of the BLING Endorsement Agreement reveals no provision stating, or suggesting, that Lim would endorse or promote BLING as a "socially conscious brand." Indeed, no language in either the BLING Endorsement Agreement or the Shareholders' Agreement states or indicates that BLING was intended to be a "socially conscious brand."

In sum, Lim has failed to sufficiently plead that the alleged Charity Promise is necessary to the performance of any of the BLING Agreements' express obligations. While Lim alleges that this promise was made to induce his entry into the BLING Agreements (Am. Compl. ¶ 122), he has failed to allege that performance of this promise is implied by the Agreements themselves, or otherwise that non-performance of this promise subverted the purpose of the Agreements. Rather, implying such a promise would create an independent obligation beyond the terms of the Agreements—one that easily could have been included in the Agreements if it reflected the parties' mutual intent. The covenant of good faith and fair dealing "'cannot be used to rewrite a contract and impose new terms.'" *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 366 (S.D.N.Y. 2012) (quoting *In re Musicland Holding Corp.*, 386 B.R. 428, 438-39 (Bankr. S.D.N.Y. 2008)).

Accordingly, Lim has failed to sufficiently allege a claim for breach of the implied covenant of good faith and fair dealing. Count 6, therefore, will be dismissed.

## CONCLUSION

For the reasons set forth above, the Court concludes that Lim has failed to properly serve No. 8 and therefore orders that service on No. 8 is **QUASHED**. Lim shall have ninety (90) days to effect proper service on No. 8. No. 8's motion to dismiss for lack for personal jurisdiction pursuant to Rule 12(b)(2) is **DENIED**.

Koon and BLING's motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is **GRANTED** as to Lim's claim for reputational harm in Count 4, Lim's claim for punitive damages in Count 5, and Count 6, and is otherwise **DENIED**. Koon and BLING's motion under Rule 9(b) is **DENIED**. Koon and BLING shall file their answer to the Amended Complaint within 14 days of this Opinion & Order.

The Clerk of Court is respectfully directed to close the pending motions at Docket Nos. 20 and 23.

**SO ORDERED**

DATED:    New York, New York
          September 30, 2025

_____
GARY STEIN
United States Magistrate Judge